# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JAYLEN FISHER, | : |
| | : Case No. 2:24-cv-906 |
| Plaintiff, | : |
| | : Judge Algenon L. Marbley |
| v. | : Magistrate Judge Elizabeth Preston Deavers |
| | : |
| OFFICER GRADY KISSEE, | : |
| | : |
| Defendant. | : |

## OPINION & ORDER

This matter comes before the Court on Defendant Grady Kissee's Motion for Summary Judgment ("Motion"). (ECF No. 69). For the reasons that follow, this Court **GRANTS** Defendant's Motion for Summary Judgment.

### I. BACKGROUND

#### A. Factual Background

On March 1, 2022, Plaintiff Jaylen Fisher and his brother, Richard Davis, went to the Barnett Recreation Center to play basketball. (ECF No. 69 at 1). Mr. Fisher was 18 years old and lived with his grandmother at the time. (*Id.*). Before leaving the house that day, Mr. Fisher attests that he grabbed a handgun and tucked it into his waistband in case he needed to protect himself given the recent events around the neighborhood at that time. (ECF No. 73 at 3). Mr. Fisher had never taken the gun out of the house before this day. (*Id.*). After playing basketball at the Rec Center for about an hour, Mr. Fisher, his brother, and a third young man they met that day, decided to walk down the street to the Marathon gas station on Livingston Avenue to grab a drink. (*Id.* at 4). While the three young men were in the gas station, several shots were fired. (ECF No. 69 at 1).

1

One shot came through the gas station window, and Mr. Fisher took cover with the other store patrons. (ECF No. 73 at 4).

Around the same time, at 4:22 p.m., the Columbus Police Department ("CPD") began receiving calls reporting that there were teens shooting at the gas station. (ECF No. 69 at 2). One caller reported that the shooter was a Black male between the ages of 16 and 18, wearing a black jacket, and black or blue pants. (*Id.*). A caller also reported that the shooter was fleeing towards the library, which sat adjacent to the Barnett Recreation Center. (*Id.*). Officer Grady Kissee and his partner, Correy Kleis, were working second shift for 9 Precinct when they heard the dispatch and began to head towards the scene. (*Id.*). Officer Krystal Mori and her partner, Rachel Schultz, also heard the dispatch and responded to the scene. (*Id.*).

Meanwhile at the gas station, the gunfire ceased so Mr. Fisher and his brother exited the store and began running towards home, cutting through the Barnett Rec Center Parking lot. (ECF No. 73 at 4). Officers Mori and Schultz were the first officers on the scene. (ECF No. 69 at 2–3). As they approached, they witnessed three or four, Black male teenagers, running from the direction of the Marathon towards the parking lot. (*Id.*). Accordingly, Officers Mori and Schultz pulled into the parking lot and approached the teens in an attempt to talk to them. (*Id.* at 3). Mr. Fisher, who had briefly stopped running, immediately began to flee on foot. (*Id.*; Mori Body-Worn Camera ("BWC") at 2:51; Fisher Tr. 80:2). At this point, Officers Mori and Schultz split up in pursuit of different teenagers — Officer Schultz pursued one individual towards the library, while Officer Mori trailed Mr. Fisher. (ECF No. 69 at 3). Officer Mori continued her pursuit of Mr. Fisher on foot as he fled toward the Whitehall Preparatory Academy. (*Id.*; ECF No. 73 at 4).

While Officer Mori had begun her pursuit of Mr. Fisher, Officers Kissee and Kleis pulled into the Barnett Rec Center parking lot. (ECF No. 69 at 3). Officer Kissee, who was in the

2

passenger seat, directed Officer Kleis to drive towards the teen that was running down Livingston Avenue to aid Officer Mori in her pursuit. (*Id.*; Kleis-Kissee Vehicle Cam at 2:17–2:26). While in pursuit, Officer Mori aired to other officers that she was chasing the suspect and that she believed he had a gun in the right side of his waistband. (ECF No. 69 at 3; Mori BWC at 3:06, 3:18–3:20). As Mr. Fisher approached the lawn of the Whitehall Preparatory Academy, Officer Kleis turned the police cruiser into the first driveway of the school and stopped the vehicle perpendicular to Mr. Fisher as he ran by. (ECF No. 69 at 4; Kleis-Kissee Vehicle Cam at 3:48–3:54). Mr. Fisher, however, continued running past the hood of the police vehicle. (*Id.*). Both officers then exited the vehicle. (*Id.*). Being in the passenger seat, Officer Kissee was able to jump out of the vehicle quickly, and began pursuing Mr. Fisher on foot, with Officer Kleis in tow. (*Id.*; Kissee BWC at 2:39–2:44). As Officer Kissee jumped out of the vehicle, the battery cartridge from his taser ripped off his belt, rendering the taser unusable. (Kissee Tr. 41:15–24). Mr. Fisher subsequently began to round the corner of the school. (ECF No. 69 at 4; Kissee BWC at 2:47). Officer Kissee attests that it was at this time that he realized Mr. Fisher had a gun. (ECF No. 69 at 4).

According to Mr. Fisher, he did not see a police vehicle headed in his direction, nor did he see an officer get out of the vehicle to pursue him. (ECF No 73 at 4). He further attests that he only realized that Officer Kissee was behind him as he began to round the corner and heard someone shout at him to get on the ground. (*Id.*). While rounding the corner, Officer Kissee, screamed "on the ground mother-fucker" and ordered Mr. Fisher to "drop the gun" twice. (ECF No. 69 at 4–5; Kissee BWC at 2:47–2:48). It was at this time that Officer Kissee drew his firearm. (*Id.*). Seconds after rounding the corner, Mr. Fisher, who was out of breath from running, began to trip and fall forward. (ECF No. 73 at 5; Kissee BWC at 2:48). As Officer Kissee rounded the corner, Mr. Fisher was on the ground face down. (Kissee BWC at 2:49). Then, Mr. Fisher can be observed rolling

over, sitting up right, and facing Officer Kissee. (*Id.* at 2:49–2:50). Mr. Fisher then tossed the gun to the side and raised his left hand in the air. (*Id.* at 2:50). Almost simultaneously, Officer Kissee fired two shots at Mr. Fisher, one hitting Mr. Fisher in the leg, and the other hitting his testicle. (*Id.* at 2:50–2:51; ECF Nos. 69 at 5; 74 at 5). A total of seven seconds elapsed from the time Officer Kissee exited his vehicle to the time the first shot was fired. (Kissee BWC at 2:43–2:50).

According to Mr. Fisher, after hearing the commands, he decided to comply and attempted to turn towards the officer, toss his gun, and surrender. (ECF No. 74 at 4–5). Mr. Fisher further stated that he thinks the gun was still in his waistband as he began to trip, and at some point while falling he pulled the gun out of his waistband to toss it away. (ECF No. 69 at 5). Officer Kissee attests that after Mr. Fisher initially fell on his stomach, he rolled over and sat up facing Officer Kissee. (*Id.*). According to Kissee, he saw Mr. Fisher point the gun in his direction, which led Officer Kissee to believe he was in danger. (*Id.*).

After the shooting, Officer Kissee can be heard yelling "drop the gun" one more time and ordering Mr. Fisher to roll onto his stomach. (Kissee BWC at 2:53). Upon rounding the corner, Officer Kleis immediately ran towards Mr. Fisher and detained him with his hands behind his back. (*Id.* at 2:58). Officer Kissee then approached to assist Officer Kleis and placed Mr. Fisher in handcuffs. (*Id.* at 2:58–3:07). Officer Mori approached as well and began assisting Officers Kleis and Kissee. (Mori BWC at 3:30). Officer Kissee then placed a tourniquet on Mr. Fisher's leg and the officers continued to render aid until the ambulance arrived. (Kissee BWC at 3:40–4:35; ECF No. 73 at 5). During this time, Mr. Fisher can be heard inquiring "why did you shoot me sir?" and exclaiming "I did not point the gun at you, run your body cam … I was throwing it down, I was throwing it down, I promise you." (Kissee BWC 4:01–4:30; Mori BWC at 3:52–5:06).

4

Mr. Fisher was later transported to the hospital for treatment, where he underwent a diagnostic laparoscopy to remove the bullet from his scrotum. (ECF No. 56 at 5). As a result of the shooting, Mr. Fisher's left testicle was shattered. (*Id.*). Relatedly, Mr. Fisher now struggles with physical activity, engaging in hard labor, and sexual activity. (Fisher Tr. 131:8–17). He further attests to suffering from incontinence. (*Id.* at133:1–24). Mr. Fisher was never convicted of a crime related to this incident. (ECF No. 56 at 5).

### B. Procedural History

On February 28, 2024, Plaintiff Jaylen Fisher brought this case against Defendants Officer Grady Kissee, the City of Columbus, the Columbus Division of Police, and the City's Chief of Police Elaine Bryant. (ECF No. 1). In his Complaint, Plaintiff asserted four claims: the first claim was brought under 42 U.S.C. § 1983 against Officer Kissee in his individual and official capacity for excessive force and unconstitutional seizure in violation of the Eighth and Fourteenth Amendments; the second was a Monell claim under § 1983 against the City of Columbus; and the third and fourth claims were state law claims of assault, battery, and negligence against Officer Kissee. (*Id.*). Defendants subsequently filed a partial motion to dismiss, requesting dismissal of the state law claims, all claims against the Police Department and the Police Chief, and any claims for punitive damages against the City of Columbus. (ECF No. 8). Plaintiff did not oppose the motion (ECF No. 13), and this Court granted the motion, leaving Officer Kissee and the City of Columbus as the sole remaining Defendants. (ECF No. 16). The remaining claims were the § 1983 claims brought against Officer Kissee and the City of Columbus. (ECF No. 8).

On September 17, 2024, Defendants filed a Motion for Judgment on the Pleadings on three bases: (1) the Eighth Amendment does not apply; (2) any potential claim for inadequate medical care is contradicted by Plaintiff's allegations; and (3) the excessive force allegations fail to state a

5

claim as drafted. (ECF No. 22). Plaintiff only opposed the Motion with respect to the excessive force claim and requested that the Court permit him to file an amended complaint to correct any pleading deficiency identified. (ECF No. 29 at 4, 12).

On July 8, 2025, Plaintiff was granted leave to amend his Complaint. (ECF No. 55). This Court then denied Defendants' Motion for Judgment on the Pleadings as moot on July 21, 2025. (ECF No. 58). Plaintiff's Amended Complaint includes one claim for relief: a claim under § 1983 against Defendant Officer Kissee in his individual and official capacity for use of excessive force in violation of the Fourth Amendment. (ECF No. 56).

On August 4, 2025, Defendant Officer Kissee filed this motion for summary judgment, which is now ripe for review. (ECF No. 69).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law. *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

6

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. LAW AND ANALYSIS

Plaintiff Jaylen Fisher brings a cause of action under 42 § U.S.C. § 1983 for violations of his Fourth Amendment rights. (ECF No. 56). Defendant Officer Kissee moves for summary judgment, arguing that qualified immunity applies because Mr. Fisher's Fourth Amendment rights were not violated given that Officer Kissee was justified in using deadly force to stop a threat of death or serious bodily injury when Mr. Fisher raised a firearm towards him. (ECF No. 69 at 6).

To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed in his favor, demonstrate the deprivation of a right secured by the Constitution or laws of the United States caused by a person acting under the color of state law. *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). The qualified-immunity doctrine, however, "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). The plaintiff bears the burden to show that a defendant is not entitled to qualified immunity. *O'Malley v. City of Flint*, 651 F.3d 662, 667 (6th Cir. 2011).

In considering Officer Kissee's qualified-immunity defense, this Court must consider first whether the facts viewed in the light most favorable to Mr. Fisher show that Officer Kissee violated his constitutional rights. *Id.* at 232. Second, this Court must determine whether the right in question was clearly established at the time of the violation, that is, whether "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (internal quotation marks, citation, and alterations omitted).

### A. Constitutional Violation

Mr. Fisher argues that Officer Kissee violated his constitutional right to be free from excessive force when he pursued him and shot him twice in the back while he was attempting to get away from an active shooter situation. (ECF No. 56 at 5). Mr. Fisher further emphasizes that any reasonable officer in this situation would have objectively understood the duty to refrain from using excessive force. (*Id.*).

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV; *Graham v. Connor*, 490 U.S. 386, 388 (1989). A claim for excessive force in violation of the Fourth Amendment requires a seizure: an intentional acquisition of physical control. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989). Further, the Sixth Circuit has found that apprehending an individual by way of shooting constitutes a seizure. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). This Court's inquiry does not end here, however, as claims of excessive force are analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness of a challenged application of

8

force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The pertinent question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

In *Graham v. Connor*, the Supreme Court articulated factors a court must consider in determining whether an officers' conduct was reasonable: "[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (quoting *Graham*, 490 U.S. at 396).

Here, Defendant Officer Kissee does not dispute that he shot Mr. Fisher, nor that this action constituted a seizure. (ECF No. 69). Rather, Officer Kissee contends that he is entitled to qualified immunity under the *Graham* factors given that: (1) he was responding to the report of a shooting at the Marathon gas station, and Mr. Fisher met the description of the shooter; (2) Mr. Fisher was fleeing; and (3) Mr. Fisher posed an imminent threat of death or serious bodily harm to Officer Kissee and the community. (*Id*. at 9–13).

### 1. Severity of the Crime

First, this Court addresses prong one of the *Graham* factors: the severity of the crime at issue. Officer Kissee was responding to "gun run" at the Marathon gas station. (*Id.* at 9). The suspects were described as Black male teenagers, with one suspect described as wearing a black top and black or blue pants. (*Id.*). Sixth Circuit case law supports that use of force is justified when the suspected underlying crime is a violent crime. *See Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 610 (6th Cir. 2020) (holding that the first *Graham* factor favored the officer using force because the officer was responding to a life-

9

threatening domestic violence situation); *Kirk v. Calhoun Cnty.*, 2021 WL 2929736, at *6 (6th Cir. 2021) (severity of crime weighed in favor of force where the individual was suspected of assaulting a police officer with a firearm); *Hunter v. Wayne Cnty.*, 2013 WL 249637, at *4 (E.D. Mich. Jan. 23, 2013) (finding severity of the crime weighed in favor of the use of deadly force where officers had information the vehicle had been stolen in an armed carjacking); *cf. Brown v. Chapman*, 814 F.3d 447, 459 (6th Cir. 2016) (finding force unreasonable where the individual involved committed two misdemeanors). Here, the suspected conduct—opening fire at a gas station—is that of a violent crime. *See United States v. Young*, 707 F.3d 598, 600 (6th Cir. 2012).

Notably, however, Mr. Fisher raises that he was not under arrest at the time he was shot nor was he ever charged with a crime in connection with this incident. (ECF No. 74 at 9). Mr. Fisher contends that he was merely fleeing from an active shooter. (ECF No. 56 at 3–4).

Mr. Fisher relies on *Smith v. City of Troy* for the proposition that "the mere failure of a citizen—not arrested for any crime—to follow the officer's commands" does not give the officer probable cause to use deadly force. 874 F.3d 938, 945 (6th Cir. 2017); (ECF No. 73 at 9). In that case, Victor Smith experienced a seizure while driving and had driven his car into a nearby lawn. After reports of suspicious activity, police arrived on scene to find Smith out of his vehicle, leaning against a fence, speaking incoherently, and not obeying commands from the officer. After attempting to pry Smith from the fence, and Smith pulling his arm away, the officer took Smith to the ground with a leg sweep and landed on top of him. Other officers arrived on the scene and deployed a taser on Smith multiple times while trying to handcuff him. 874 F.3d. at 942. The court ruled that given Smith had committed no crime, was never informed he was under arrest, and was unarmed, there was no justification to put him in handcuffs or to use excessive force merely because he refused to follow commands. *Id.* at 945.

*Smith v. Troy* is distinguishable from this case. First, the officers in *Smith* were responding to calls of "suspicious activity," which is not a violent crime. *Id.* at 942. Here, Officer Kissee was responding to reports of an active shooter. (ECF No. 69 at 9). While this Court notes that like Mr. Smith, Mr. Fisher was not under arrest or ultimately charged with a crime, the facts are starkly different. Unlike Mr. Smith, Mr. Fisher was armed, fleeing from the vicinity of a violent crime, and matched the description of the suspect from the gas station shooting. (*Id.* at 9–10). Further, it is not dispositive that an officer is mistaken about the identity of the suspect where a violent crime was being investigated. *See Humphrey v. Mabry*, 482 F.3d 840, 849 (6th Cir. 2007) (officers need not wait to determine whether individual was the right person prior to use of force, where they had authoritative information that the suspect was armed with a gun and made a threat); *see also Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 850–852 (6th Cir. 2016) (officer used excessive force in responding to an armed-robbery not because the officer mistook the individual for the suspect, but because the officer used force against an individual who had surrendered). As such, this Court finds that the severity of the crime at issue militates towards the use of deadly force being reasonable, despite the officers being mistaken about the identity of Mr. Fisher.

2. *Imminent Threat*

The second Graham factor asks whether Mr. Fisher posed an immediate threat to the safety of the officers or others. As discussed, Mr. Fisher was fleeing from the vicinity of a reported shooting, Officer Mori was trailing him on foot, and Officers Kleis and Kissee were pursuing him in their vehicle. (ECF No. 69 at 4). As Officer Kissee began his pursuit of Mr. Fisher on foot, Mr. Fisher's back was facing Officer Kissee. (Kissee BWC at 2:44–2:48). It was not until after Mr. Fisher tripped and fell that the men were face to face. (*Id.* at 2:50). It is in this moment where Mr. Fisher rolled over and sat up, that Officer Kissee contends Mr. Fisher extended his arm pointing

his weapon towards him and caused him to have an imminent belief that he faced serious physical harm or death. (*Id.* at 2:50–2:51; ECF Nos. 69 at 10; 73 at 9). Alternatively, Mr. Fisher contends that he was attempting to surrender and tossed the gun to the side before Officer Kissee shot him. (ECF No. 73 at 9).

Relying on the expert testimony of Roger Clark, a twenty-seven-year veteran of the Los Angeles County Sheriff's Department, Mr. Fisher contends that if he was pointing the gun at Officer Kissee, excessive force may have been reasonable; however, this fact is not substantiated by the available evidence. (ECF No. 73 at 10). According to Clark, Mr. Fisher was not armed nor was he pointing at a gun at the time he was shot. (*Id.*; Clark Tr. 75:5–7). Plaintiff asserts that given there is a genuine dispute as to the material fact of whether or not Mr. Fisher was pointing at Officer Kissee, this Court must deny summary judgment. (ECF No. 73 at 11). Further, Mr. Fisher asserts that the court should not second guess a split-second decision of an officer ***only where*** the officer was ***forced*** to make such a decision. (*Id.*).

Officer Kissee counters that regardless of whether Mr. Fisher was holding the gun when he got shot, the analysis does not change given that it is undisputed that he had a gun in his hand at some point after falling. (ECF No. 69 at 12). Specifically, Officer Kissee argues that deadly force is reasonable if the officer had witnessed a suspect removing a concealed gun and throwing it away within seconds of the deadly force being employed. *See Mullins v. Cyranek*, 805 F.3d 760, 766–767 (6th Cir. 2015) (finding deadly force justified where suspect threw gun down five seconds before being shot despite hindsight showing that the officer could have escaped unharmed); *Nelson v. Battle Creek*, 802 F. App'x 983, 988 (6th Cir. 2020) (finding deadly force reasonable where suspect drew a BB gun that resembled a real handgun and dropped it seconds before he was shot). In both cases cited by Officer Kissee the Sixth Circuit demonstrated its unwillingness to second

12

guess the split-second decisions of an officer faced with such circumstances but instead emphasized its focus on what a reasonable officer in the circumstances might have done. *See id.* at 988–989; *Mullins*, 805 F.3d at 767.

The Sixth Circuit's decision in *Mullins v. Cyranek* is instructive here. In *Mullins*, Davon Mullins was fatally shot during a stop and frisk incident involving the Cincinnati Police Department. Officer Oscar Cyranek was assigned to provide security at an event where officers received a report that young Black males were spotted throwing weapons over a fence to other individuals who were inside the event. Cyranek and other Cincinnati Police Officers then approached a group of suspects who fled. Later on, while providing security at another location Cyranek spotted Mullins with two of the individuals he had encountered earlier. Cyranek observed Mullins holding his right side and decided to approach Mullins, who complied with being stopped initially, but ultimately an altercation ensued in which Cyranek took Mullins to the ground. Cyranek attested that during the struggle, he witnessed Mullins holding a weapon in his right hand. Mullins then proceeded to throw the weapon away and at most five seconds later Cyranek shot Mullins twice. *Mullins*, 805 F.3d at 762–764.

The Sixth Circuit noted that the crux of the issue was whether it was reasonable for Cyranek to believe that Mullins posed a significant threat at the time Mullins was shot. *Id.* at 766. Cyranek admitted that Mullins had thrown the weapon prior to being shot, but argued that the rapid succession of the altercation impacted his ability to assess the situation. Thus, the Sixth Circuit noted that while rapidly evolving situations alone do not make the use of deadly force reasonable, given the fact that Mullins pulled a gun during a police stop and only threw it away seconds before the first shot, the situation presented a serious threat to the officer and the public. *Id.* at 766–767. Moreover, "Cyranek's second shot came within the time frame in which a reasonable officer could

13

have acted under the perception that Mullins was still armed." *Id.* at 768. As such, the Sixth Circuit reasoned such facts precluded a jury from concluding that Cyranek was never in danger and further forced Cyranek to make a split-second decision. *Id.* at 766–768.

Similarly, here, even though the events of this incident unfolded very quickly, and the bodycam footage is not the best quality, it is evident that the gun was no longer in Mr. Fisher's hand at the time of the first shot. (Kissee BWC at 2:50–2:51). In his deposition testimony, Officer Kissee even admitted that during his interview with BCI on May 20, 2022, he stated that "[a]fter reviewing this footage and slowing it down frame by frame, it appears the suspect may have been attempting to toss the gun when I saw him raising it at me." (Kissee Tr. 64:17–22). However, this Court also recognizes that the bodycam footage is not clear enough to distinguish whether the gun was truly pointed in Officer Kissee's direction. (Kissee BWC at 2:49–2:50; *see also* Albin Tr. 145:21–22). Further, while officers are not entitled to shoot a suspect merely because he has a gun, they also need not wait until the gun is pointed at them to apply force. *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1097 (6th Cir. 2023).

Notably, however, Mr. Fisher discarded the gun within the same second in which the first shot is fired. In total, from the time that Mr. Fisher fell, discarded the gun, and was shot, only two seconds had elapsed. (Kissee BWC at 2:48–2:50). Thus, even more so than in *Mullins*, the extremely tight timeline here prevents this Court from fairly determining that a reasonable officer in similar circumstances would not have had a belief that Mr. Fisher posed an imminent threat. Although the gun was no longer in Mr. Fisher's hand when he was shot, where an officer is faced with a rapidly evolving situation, as the one here, it is inappropriate for the court to second-guess the reasonableness of deadly force. *Mullins*, 805 F.3d at 767; *see also Puskas*, 56 F.4th at 1096.

As such, Officer Kissee did not need to be certain that the gun was being pointed at him to apply deadly force. Rather, considering that Mr. Fisher had pulled a gun, and was facing Officer Kissee, Officer Kissee did not act objectively unreasonably. *See Thornton v. City of Columbus*, 727 F. App'x 829, 837 (6th Cir. 2018) (finding deadly force reasonable where suspect was within in close range of officers holding a shotgun, but not pointing it at them, and failed to comply with an order to drop the weapon); *Gambrel v. Knox Cnty.*, 25 F.4th 391, 405 (6th Cir. 2022) (finding deadly force lawful where an officer "could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong).").

Thus, under the second *Graham* factor, the facts here also support that the use of deadly force by Officer Kissee was not objectively unreasonable.[1]

### 3. Actively Resisting or Evading Arrest

Finally, the third *Graham* factor asks whether the individual was actively resisting arrest or attempting to evade arrest by flight. Mr. Fisher first encountered Officer Mori in the library parking lot, where he was already fleeing from the scene of the shooting, but briefly came to a stop. (ECF No. 69 at 3). Upon seeing Mr. Fisher, Officer Mori shouted "woah, what's going on,

---

[1] This Court would be remiss not to note that a total of seven seconds elapsed from the time Officer Kissee exited his vehicle to the time the first shot was fired. (Kissee BWC at 2:43–2:50). Even more noteworthy is that Officer Kissee issued his first command for Mr. Fisher to drop the weapon within two seconds of firing his first shot. Such situations give suspects no meaningful opportunity to comply. *Tallman v. Elizabethtown Police Dep't*, 167 F. App'x 459, 469 (6th Cir. 2006) (Clay, J., dissenting) ("[A] reasonable jury could conclude that the warning he gave . . . was doomed to be ineffectual. Indeed, the tape shows that the warning . . . was practically useless because [the suspect] had no time to comply with it."). Not only did Mr. Fisher not have time to comply, but the video makes clear that he did start to comply and ultimately tossed his weapon away prior to being shot. This Court finds it important to note the poignant irony that the act of compliance with the officer's commands is exactly the action that led to Mr. Fisher being shot. Qualified immunity is available in cases where officers are forced to make "split-second decisions" in the face of threats. *See Mullins* at 766–67. In this case, only 2 seconds had passed, and therefore, the officer was making a split-second decision. While this Court is not deciding a case where more than a couple seconds had passed between a command to comply and a shot fired, such circumstances would provide an officer with additional time to consider whether the person in front of them was, in fact, complying, not preparing to shoot. *See Cole v. Hutchins*, 959 F.3d 1127, 1134–35 (8th Cir. 2020) (holding it is clearly established that "a few seconds is enough time to determine an immediate threat has passed" and that "a person in possession of a firearm is not an immediate threat unless he appears 'ready to shoot'").

hey!", but Mr. Fisher continued to run. (Mori BWC at 2:51–3:00). While Mr. Fisher attested to not knowing he was being chased on foot until Officer Kissee began shouting commands at him as he rounded the corner of the school, Mr. Fisher admits to seeing officer Mori approach him in the parking lot. (ECF Nos. 73 at 4; 69 at 3). Thus, Mr. Fisher had already begun to evade police prior to his encounter with Officer Kissee. *Gambrel*, 25 F.4th at 402 (finding a suspect resisted arrest where he refused to comply with an officer's command to stop and fled in the opposite direction). Therefore, this Court does not find it dispositive that Mr. Fisher began to fall and throw his weapon within two seconds of being commanded to drop his weapon by Officer Kissee—he was already in a foot chase well before this point. (Kissee BWC at 2:48–2:51; Mori BWC at 2:51–3:20). Thus, the third Graham fact also militates towards a finding that Officer Kissee's use of force was reasonable. As such, the evidence does not support the fact that Officer Kissee violated Mr. Fisher's Fourth Amendment right to be free from excessive force.

### B. Clearly Established

Having concluded that Officer Kissee did not violate Mr. Fisher's right to be free from excessive force, this Court need not analyze the clearly established prong of the qualified immunity test. *Thornton*, 727 F. App'x at 838 (While a plaintiff must establish *both* a constitutional violation *and* that a right was clearly established, the Sixth Circuit recognized that courts need not evaluate the "clearly established" prong of the qualified immunity test where the plaintiff failed to establish that the officers had violated a constitutional right by using deadly force.).

## IV. CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**. This case is DISMISSED.

**IT IS SO ORDERED.**

                                          **ALGENON L. MARBLEY**
                                          **UNITED STATES DISTRICT JUDGE**

**DATED: March 6, 2026**